# Exhibit A

*Deposition of Deputy Alexander Maldonado*

*March 8, 2023.*

Page 1

IN THE CIRCUIT COURT OF THE
THIRTEENTH JUDICIAL CIRCUIT OF THE
STATE OF FLORIDA IN AND FOR HILLSBOROUGH COUNTY

STATE OF FLORIDA,

    Plaintiff,

        vs.                 CASE NO. 22-CF-011334

JULIAN ANDREWS,

    Defendant.
_____/


VIRTUAL DEPOSITION OF DEPUTY ALEXANDER MALDONADO


DATE:                    March 8, 2023

TIME:                    2:00 p.m.

PLACE:                   Various Remote Locations
                         Via Zoom Video Communications




REPORTER:                KIMBERLY L. RENFROE, RPR
                         Registered Professional Reporter

Reliable Reporting, Inc
728 S. New York Avenue, Lakeland FL 33815        863-682-8737

DISC-00228

VIRTUAL
APPEARANCES:          CHRISTINE E. BOULOS, ESQUIRE
                      Assistant State Attorney
                      419 Pierce Street
                      Tampa, Florida  33602
                           For the State


                      VICTORIA E. HATFIELD, ESQUIRE
                      O'Brien Hatfield Reese, P.A.
                      511 West Bay Street
                      Suite 330
                      Tampa, Florida  33606
                           For the Defendant


ALSO PRESENT:         Hana Shitama, Paralegal
                      O'Brien Hatfield Reese, P.A.

DISC-00229

INDEX

March 8, 2023

VIRTUAL DEPOSITION OF DEPUTY ALEXANDER MALDONADO

Direct Examination by Ms. Hatfield .............4

CERTIFICATE OF OATH ...........................24

REPORTER'S DEPOSITION CERTIFICATE .............25

Reliable Reporting, Inc
728 S. New York Avenue, Lakeland FL 33815        863-682-8737

DISC-00230

Page 4

DEPOSITION IN DISCOVERY

DEPUTY ALEXANDER MALDONADO

Pursuant to notice duly given, the virtual deposition of DEPUTY ALEXANDER MALDONADO, called by the Defendant in the above-styled cause, was taken by me, a Notary Public in and for the State of Florida at Large, at the time and place and in the virtual presence of counsel enumerated on Page 2 hereof.

Thereupon, it was stipulated and agreed by and between the attorneys for the respective parties, by and with the consent of the said DEPUTY ALEXANDER MALDONADO, that signature to the said virtual deposition be waived.

THE COURT REPORTER:  Would you raise your right hand for me, please?

Do you swear or affirm that the testimony you're about to give will be the truth, and nothing but the truth, so help you God?

THE WITNESS:  Yes.

THE COURT REPORTER:  Thank you.

DEPUTY ALEXANDER MALDONADO, having been first duly sworn via Zoom Video Communication, upon interrogation in discovery, testified as follows:

DIRECT EXAMINATION

BY MS. HATFIELD:

Q.   Hello.

Page 5

Can you state your first name and spell your last name for me?

A.    Alexander, last name Maldonado, M-A-L-D-O-N-A-D-O.

Q.    And then you're -- how are you employed?

A.    Employed with the Hillsborough County Sheriff's Office.

Q.    In what capacity?

A.    Deputy.

Q.    And were you in a deputy back on August 21st of 2022?

A.    Yes, ma'am.

Q.    How many total years have you been with Hillsborough County Sheriff's?

A.    Since March of 2020.

Q.    Okay.

Do you have any law enforcement experience prior to the sheriff's office?

A.    No, ma'am.

Q.    Drawing your attention to August 21st, I know you were involved in the arrest of Julian Andrews; do you remember that day?

A.    Yes, ma'am.

Q.    Were you involved at all in arresting Mr. Andrews on prior occasions?

DISC-00232

Page 6

A.    No, ma'am.

Q.    Okay.

So was this the first time you ever encountered Mr. Andrews either on a personal or professional level?

A.    Yes.

Q.    Okay.

And did you actually conduct a traffic stop?

A.    Yes.

Q.    Take me through just what you observed that caused you to want to stop him.

A.    As I was traveling eastbound down U.S. 92, the motorcycle was going west -- I was traveling westbound on U.S. 92 and the vehicle -- the motorcycle was traveling eastbound.  The tag was obscured because it was flipped up; so rather than the tag sitting straight up and down, it was actually flipped up.  So you couldn't see the tag, it was obscured.  There was no tag light.

Q.    Okay.  So with regard -- with regard to it being flipped up, was this something that, like, maybe the forces of nature did because it's a dirt bike or was it installed wrong?  Can you expand on that just a little more?

A.    No, this was a -- a -- this was like -- not a dirt bike, it was a street legal motorcycle; and it

DISC-00233

Page 7

was -- the tag was altered.  It wasn't mounted that way; it was flipped up.

Q.    Like the wind flipped it up or something like that?

A.    Negative.  It was a hard plate.  It was a metal plate.  It was affixed in an upright manner so it was obscured.

Q.    Okay.  So it was the way it was put on?

A.    Yes.

Q.    Okay.  Got it.

So is it fair to say you were not able to run the plate or anything prior to pulling Mr. Andrews over, right?

A.    Correct.

Q.    Okay.

And then not having a tag light; so for street-legal motorcycles, you need to have a tag light just like an automobile.  Do I have that correct?

A.    For any motor-vehicle you have a light affixed to the rear of the vehicle.  You have to be able to make out the tag from 50 feet.

Q.    Okay.

And is this a situation where there was no light, period, or it was out?

A.    There was no light at all and the tag was

DISC-00234

Page 8

obscured.

Q.   Got it.

Okay.  So then take me through what happened.

Did he pull over initially?

A.   So as we were approaching the intersection of Parsons and 92, still going eastbound, I always activate lights and sirens at the same time.

He -- I could hear the throttle, like he let off the throttle as he began to role southbound on Parsons; and then he pulled into -- there's an entrance to the Circle K there off of Parsons.

So he pulled into the intersection or the entrance there; and as he was pulling in he got back on the throttle in an attempt to flee but the bike stalled out. So I repositioned my bike -- my vehicle in front of him as my partner pulled in behind him.

Q.   Did you -- were you in a car or a bike?

A.   I was in a marked Tahoe.

Q.   Got it.

Did you ever open the door or even stop your vehicle when it looked like he was slowing down or did you not even get that far?

A.   No, my vehicle was in park.

Q.   It was in park.  Okay.

A.   When he got back on the throttle and attempted

Page 9

to flee.

Q.   Got it.

And then you all -- how did you get back-up there already; did you call for a back-up right away?

A.   No.  Me and my zone partner work closely together.

Q.   Got it.

A.   So we're in the same area.

Q.   For situations just like this I assume, right?

A.   Is that a question?

Q.   Yes.

A.   Yes.

Q.   Okay.  Got it.  Just trying to understand.

So you all essentially box him in; and what did he do, hop off and run?

A.   Yeah.  I pulled in -- I pulled up in front of him once I heard him trying to get back on the throttle and then my partner pulled in behind him.  At that point I exited my vehicle; I told him multiple times to stop the bike, to get off the bike, at which point in time he got off the bike and took off running.

Q.   Who was your partner that boxed him in with you?

A.   It was Deputy Zackman.

Q.   Do you remember if he had his lights, sirens

Page 10

and/or both going?

A.   He had his lights on.

Q.   Okay.

And were you all in uniform?

A.   Yep, Class B uniform of the day which is what I'm wearing right now.

Q.   Got it.

Are you able to tell me what you observed Mr. Andrews to be wearing at the time that you pulled him over?

A.   Yes.  He was wearing a white tee shirt with an SG logo on the back, with blue jean shorts, and he had a black backpack on.

Q.   Okay.

And was this a backpack where's there's two straps that go over each shoulder, or is it like the -- all the rave now, everybody's wearing like these fanny packs across the chest; can you be a little more specific on what the backpack looked like?

A.   It was a black backpack with a strap on each shoulder; so it was your standard, typical going-to-school backpack; it was not a cross-body sling or anything like that.

Q.   Got it.  Cross-body sling, that's what I was looking for.

Page 11

Did he, in fact, have a strap over each shoulder or was he wearing it two straps over one shoulder; do you remember that?

A.    When he was on the bike he had it with both straps, and as he took off running he was able to remove the straps off his shoulders and was carrying it by the -- there's like a little handle loop on the top --

Q.    Yeah.

A.    -- he was carrying it by that as he was running.

Q.    Okay.  So take me through that.

So we're at the point now where he hops off the bike and you're with your partner.

A.    So he starts running southbound, there was a couple of vehicles coming northbound on Parsons.  There is fences on -- that's a two-lane road so north and southbound lane, and there's fences that kind of run down that portion of the road.

So he runs southeast towards a black pick-up truck; goes along the side of the passenger side of that vehicle; at the same time that he's running, he's taking the backpack off; he's carrying it with his left hand and then he runs back across Parsons in a southwest direction towards the fence line.  At that point he transitions it into his right hand and starts bringing

DISC-00238

Page 12

it up towards his chest.  At that point I deployed my
first set of tasing probes which missed; and then I
deployed a second set of taser probes which had a
positive impact.  He went down and we were able to take
him into custody.

Q.   Did the first one hit anything or anybody?

A.   No, ma'am.

Q.   Okay.

So let's back up for a second.

So just based on your training and experience, had
Mr. Andrews just stayed on his bike and was cordial and
gave you his license and all that, just the worst he
would have been looking at is the obscured tag and not
having a tag light.  Do I have that correct or am I
missing something?

A.   Yeah.  We would have done the traffic stop,
ran the tag, made sure the vehicle's not stolen or
anything like that, verified the VIN, got his
information, and gone from there.

Q.   Okay.

When you say gone from there, was there -- is there
anything else that could have landed him other charges
at that point other than the tag and the light?

A.   Well, we later learned that he did have four
active warrants.  I think it was a combined, like, seven

Page 13

different charges on them.

Q. Right.

A. So upon, you know, finding out he had warrants, he would have been taken into custody based on that.

Q. What about -- did you eventually run the tag?

A. I personally did not; one of the other deputies on scene did.

Q. As you sit here today, do you know if the tag was valid and the bike was clean?

A. The bike I know was not stolen, whether or not the tag was current I'm not a hundred percent sure of.

Q. Okay. All right. Fair enough.

All right. So initially you got him for the two traffic citations. At the point that he gets off his bike and starts running, now you got him for the traffic citations in addition to the fleeing and eluding; correct?

A. Had he stayed on the bike, it would have been a fleeing to elude because he's on a motor vehicle on a roadway; but because he got off on foot and began to run, the new charge would have been resist without violence.

Q. Thank you. Okay. That's why I ask these questions. Okay. Interesting. Thank you for

DISC-00240

Page 14

clarifying that.

Anything else that I'm missing?  So we've got the resisting without violence, the -- the citations; anything else you could have possibly gotten him for before you actually took him into custody?

A.   Just looking at it purely based on the traffic stop, running his name and verifying that he had warrants, at that point in time, no.

Q.   Okay.  Got it.

All right.  So it's my understanding you decide to tase him when the backpack is kind of raised up and he has access to it; is that right?

A.   Yes.

Q.   And is that an officer safety situation, you don't know if he could have a gun or shoot you or?

A.   Correct.  Most times in incidents where subjects are fleeing or running from us they want to discard any objects that are on their person, like kind of separate themselves from whatever it is.  In this case we ran for approximately 15 to 30 yards, at which point in time Mr. Andrews never discarded his backpack, which I found to be odd.  So when he brought it up to his person -- well, bring it up to his chest, I don't know what's in that bag, I'm concerned for my safety, I'm concerned my partner's safety, so I did deploy my

DISC-00241

Page 15

taser.

Q.    Got it.

And then I know the first one missed, the second one hit him; take me through what happened after that.

A.    So we -- my partner's on his left side, I'm on his right side; we're trying to get his arms behind his back.  We're able to get his left arm behind his back; however his right arm is still concealed under his body.  When the taser hit him, he pretty much lost out, fell straight forward, the bag flew up in the air, but we don't know what he's trying to reach for with his right arm.  We don't know if he has anything along his waistband or anything like that.

Q.    Because it's under his body; is that right?

A.    Correct.  His right arm was -- was under his body.

Q.    Okay.

Where's the backpack at this point?

A.    The backpack?

Q.    I know it was in the air, but where did it land?

A.    Approximately three to five feet in front of him.

Q.    Okay.

And then you say you have his left arm?

Page 16

A.    So my partner has his left arm behind his back, we're trying to get his right arm behind his back.

Q.    Okay.

And there is a concern he's within reaching distance or could get access to this backpack, right?

A.    Backpack or whatever he may or may not have had on his person.

Q.    Okay.

A.    We still haven't been able to conduct a, you know, search of him to make sure he doesn't have anything else on him.

Q.    Okay.

So eventually you get that right arm or what happens?

A.    Yeah.  So we're all trying to get the right arm, giving him multiple verbal commands to give us his right arm, trying to pull on it; he's bracing, tensing, so I dry stunned him with the taser.  At that point his right arm comes back to his -- the backside of his body, we're able to get handcuffs on him, we roll him to his left side, pat him down, and then we roll him to his right side, pat him down.  At that point I bring him back to the vehicle.

Q.    Okay.

So, is it fair to say that Mr. Andrews is placed in

DISC-00243

Page 17

cuffs before he stood up and escorted to the vehicle?

A.    Correct.

Q.    Okay.

And one of you -- I have body camera footage, I don't know whose it is.  But as he's -- one person escorts him to the vehicle and it looks like the other officer gets possession of the backpack and there's like a wallet, and basically just picks up everything that's on the ground.

A.    Correct.

Q.    Okay.  Which one did you do?

A.    So I escorted Mr. Andrews to -- back to my vehicle and Deputy Zackman collected all the items left on the scene --

Q.    Okay.

A.    -- or on the ground.

Q.    So when I watched the body camera video, Zackman, now that I know it's Zackman, he takes everything and then he brings it to the back of his truck -- I think he had a truck or somebody had a truck -- and then he opens the bed of the truck and that's where he starts searching everything.

Is that Zackman or did you at some point search?

A.    Yeah.  So I was at my -- I have a marked Chevy Tahoe and he has a marked Chevy Silverado, so he has a

Page 18

pick-up truck style.  So he dropped the lower tailgate

of his truck and I believe searched everything right

there.

Q.  Got it.

Did you participate in that search at all?

A.   Not initially.  I was still dealing with

Mr. Andrews because we have procedures and protocols.

We were notifying our supervisor as well as getting Fire

and Rescue to attend to him and make sure he doesn't

have any heart issues or anything going on with him

since he just got tased.  So I was addressing that as he

began to search the backpack.

Q.  Okay.  Fair enough.

And then when did you participate on searching the

backpack?

A.   So after we got more units on scene,

Deputy Zackman had made me aware of all the contents

that were within the backpack and I walked over and

looked at everything as it was placed on the tailgate of

the vehicle.

Q.  Going backwards for a second, we have the

backpack and then there some loose items that -- that

Zackman picked up from the ground.

Are you able to testify to what the loose items

were or is that a question for him?

DISC-00245

Page 19

A.    That would be a question for him.

Q.    Okay.

So to the best of your knowledge anything that was contraband was actually found within the backpack; correct?

A.    Everything that was contraband was located within that backpack.

Q.    Okay.  Fair enough.

Did you talk to Andrews?

A.    Yes, ma'am.

Q.    Let's start with spontaneous statements.

Did he make any spontaneous statements in your presence that you would be able to testify to?

A.    The only spontaneous statements that were made were once we initially got our hands on him we asked him why -- why was he running, and if he has any weed on him because we could smell the odor of marijuana.  Aside from that, there was no other spontaneous statements made or -- or asked at that point in time.  Other than just checking for his -- trying to get those probes out of him and explain what was going to take place next.

Q.    Okay.

And then what about did you do anything like read him Miranda or get a post-Miranda statement?

A.    Yeah.  So he was transported to Tampa General

DISC-00246

Page 20

Healthplex off of Falkenburg Road down in Brandon.

Q.   Yeah.

A.   Once we got there and he got assigned to a room, just due to HIPAA we always deactivate our cameras while we're inside the actual hospital; but once he was actually in a room is when I reactivated my camera, read him Miranda on camera, and then conducted my interview.

Q.   Okay.  So all that's recorded?

A.   Yes, ma'am.

Q.   And he decided to talk to you, right?

A.   Correct.

Q.   And it's my understanding he admitted to you that he was going to be paid in cocaine to transport this backpack from Point A to Point B, but he didn't know what was inside; is that a fair summary or?

A.   Correct.  He told me he had met up with a friend that he had met through somebody while incarcerated previously.  He didn't divulge any kind of a timeline of how this meeting was planned or anything like that.  The way he described it was like it was just they happened to run into each other, they knew each other, and the other gentleman asked him to transport the bag and the bike to a bar in our -- it's located within District 2, called Finish Line Saloon.

At that point in time he would just deliver the

DISC-00247

Page 21

bike and bag to an unknown person in hopes that he would get compensated in the form of cocaine, due to having a cocaine addiction.

Q.   Okay.

Did you all try to get him to set that person up or actually go through with the delivery; any sort of like cooperation?

A.   So, in my position on patrol we did not try to initiate anything like that.

Q.   Okay.

Does Hillsborough County Sheriff's Office have some sort of drug unit?

A.   Yes.

Q.   Okay.  What was the unit called; is it called anything special?

A.   It falls under our Special Investigations Division.

Q.   Okay.  Fair enough.

Did anyone from that division show up?

A.   On scene, no.

Q.   Okay.

Did they get involved later?

A.   Not to my knowledge.

Q.   Okay.

So everybody that's involved in this case -- and

DISC-00248

Page 22

was a detective ever assigned?

A. There was a general -- so we have -- at the district level we have General Offense detectives and then we have Intelligence Led Policing detectives. I believe one of the ILP detectives, he -- he got the Gold Seal through the State for this case. Aside from that though, I'd have to -- there's -- to my knowledge, nobody else went and spoke to Mr. Andrews.

Q. Okay.

What does that mean he got a Gold Seal from the State? Like just showing that he had never had any pardons or anything like that, is that what you're talking about?

A. I've never gotten one so I don't -- I don't know exactly what it -- what it would be --

Q. Okay.

A. -- so I don't want to attest to that.

Q. Okay. I get it.

Anything else that you did?

A. I mean we -- once we had everything we took it back to the district, had it weighed out and then impounded it in the evidence control section.

Q. Were you surprised with what you found in the backpack?

A. Yeah.

Page 23

Q.   Okay.

Was -- was there any sort of tip or anything that you got beforehand or was this just a really lucky stop?

A.   It was just a really lucky stop.

Q.   Got it.

MS. HATFIELD:  All right.  I'll pass the witness.

Let's see if the State has anything for you. Hang on a second.

MS. BOULOS:  There are no questions from the State.

Thank you so much, sir.

THE WITNESS:  Thank you, ma'am.

MS. HATFIELD:  You want to read or waive?

THE WITNESS:  I'll waive.

MS. HATFIELD:  All right.  You're free to go. Have a good day.

THE WITNESS:  Thank you, ma'am.

THEREUPON, the deposition concluded at 2:19 p.m.

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

I, the undersigned authority, certify that DEPUTY ALEXANDER MALDONADO personally appeared before me via Zoom Video Communications on March 8, 2023 and was duly sworn.

Witness my hand and official seal this 15th day of April, 2023.

KIMBERLY L. RENFROE, RPR
Registered Professional Reporter

Notary Public, State of Florida
Commission No.:  HH 80650
Expiration date:  1/31/25

Page 25

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

I, KIMBERLY L. RENFROE, Registered Professional Reporter, certify that I was authorized to and did stenographically report the virtual deposition of DEPUTY ALEXANDER MALDONADO; that a review of the transcript was not requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with this action, nor am I financially interested in the action.

Dated this 15th day of April, 2023.

_____
KIMBERLY L. RENFROE, RPR
Registered Professional Reporter


(Transcript was ordered by Victoria E. Hatfield, Esquire, on March 23, 2023.)

Reliable Reporting, Inc
728 S. New York Avenue, Lakeland FL 33815          863-682-8737

DISC-00252